**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | ) Criminal No. 15-248 |
| | ) Judge Nora Barry Fischer |
| DONALD R. TAYLOR, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.     INTRODUCTION

This is a white collar criminal case arising from an alleged fraud on the United States Department of Transportation's Disadvantaged Business Enterprise Program ("DBE Program") by Century Steel Erectors ("CSE") and WMCC, Inc., and their respective principals. (Docket No. 1). In this case, the Government has charged one of the owners of CSE, Defendant Donald Taylor, with fourteen separate criminal offenses. (Docket No. 1). The Government generally maintains that Defendant and CSE used WMCC, Inc., a certified disadvantaged business entity, ("DBE"), as a "front" to obtain 13 federally funded highway construction contracts requiring DBE status, and that CSE performed the work on the jobs while it was represented to agencies and contractors that WMCC would be performing the work. (Id.). The Government contends that WMCC did not perform a "commercially useful function" on the jobs as the DBE regulations require and that CSE personnel did the actual work, taking great efforts to conceal from general contractors and government entities that CSE and its personnel were doing the work. (Id.). According to the Government, WMCC's principal, Watson Maloy,[1] was paid a relatively nominal "fixed-fee" for permitting use of WMCC's name on each of these subcontracts. (Id.).

---

[1]       The Court notes Maloy has pled guilty to one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. *See United States v. Maloy*, Crim. No. 14-235, Docket No. 9 (W.D. Pa. Nov. 12, 2014).

At issue in this Memorandum Opinion are Defendant's Motion to Dismiss the Indictment and his Motion to Suppress Evidence, both of which are opposed by the Government.[2]  (Docket No. 33).  The Motions have been fully briefed.  (*See* Docket Nos. 33, 35, 40, 44, 46, 51, 52). The Court held a motion hearing on December 12, 2016, at which time the parties presented a joint stipulation of facts, (Docket No. 48), and a stipulated exhibit, (Docket No. 49-2), and the attorneys presented oral argument as to the pending motions, (Docket No. 53).  After careful consideration of the parties' arguments and for the following reasons, Defendant's Motions to Dismiss and to Suppress Evidence [33] are DENIED.

II.      RELEVANT PROCEDURAL HISTORY

The grand jury returned its Indictment in this case on November 19, 2015.  (Docket No. 1).  Defendant is charged with fourteen separate offenses: (Count 1) one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371; (Counts 2-3) two counts of wire fraud in violation of 18 U.S.C. § 1343; (Counts 4-11) eight counts of mail fraud in violation of 18 U.S.C. § 1341; (Count 12) one count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h); and (Counts 13-14) two counts of engaging in monetary transactions derived from unlawful activity in violation of 18 U.S.C. §§ 1957(a) and 2.  (*Id.*).  Given the complexity of the matter, the Court granted Defendant several extensions of time to file pretrial motions.  (Docket Nos. 13, 16, 18, 28).

Defendant filed his Omnibus Pretrial Motion and supporting Brief on July 27, 2016. (Docket Nos. 33, 35).  After receiving extensions of time from the Court, the Government filed its response on October 17, 2016.  (Docket No. 40).  The Court granted Defendant leave of court

---

[2]      The Court notes that Defendant filed an Omnibus Pretrial Motion and Supporting Brief setting forth several different requests for relief, some of which are not at issue here.  (Docket Nos. 33, 35).  To this end, Defendant's motion for a bill of particulars was denied, as moot, at the motion hearing.  (*See* Docket No. 49).  The Court will also issue a separate order denying Defendant's motion to compel *Brady* material as premature and without prejudice to raising same pursuant to any Pretrial Order issued by the Court.

to submit a reply brief and he did so on November 7, 2016. (Docket No. 44). The Government then filed its sur-reply on November 15, 2016. (Docket No. 46). The Court held a motion hearing on December 12, 2016. (Docket Nos. 49, 53). At the hearing, the parties requested the opportunity to file supplemental briefs on matters raised at the hearing, and such request was granted by the Court. (Docket No. 49). Thereafter, the Government filed its supplemental brief on December 13, 2016, (Docket No. 51), with Defendant filing his response to same on December 19, 2016, (Docket No. 52). The official transcript of the motion hearing was produced and filed with the Court on January 6, 2017. (Docket No. 53). In light of these submissions, the pending motions are now fully briefed and ripe for disposition.

III.    MOTION TO DISMISS

The Court first turns to Defendant's Motion to Dismiss the Indictment wherein he seeks to dismiss the charges for a host of different reasons, all of which are opposed by the Government. (Docket Nos. 33, 35, 44, 52). Briefly, Defendant argues that Count One must be dismissed because he has been purportedly mischarged under the "defraud clause" of 18 U.S.C. § 371, in that the allegations do not support a charge that he defrauded the United States. (*Id.*). He contends that the DBE program is administered through state and county entities, such that he could not have defrauded the United States, which he believes merely provides funding to the states to administer the DBE program. (*Id.*). Defendant also argues that the Indictment must be dismissed because the underlying federal regulations, 49 C.F.R. § 26.55(c), that support the counts against him are allegedly void for vagueness as applied to the facts at issue. (*Id.*). More specifically, he challenges the definition of "commercially useful function" set forth in the regulations and also contends that Congress improperly delegated its duties to the Executive branch in promulgating the regulations at issue. (*Id.*). The Government counters that the charge

at Count One is supported by the allegations in the Indictment which make clear that the charge is for defrauding the United States' DBE program rather than the state and county entities. (Docket Nos. 40, 46, 51). The Government adds that the challenged regulations are neither unconstitutionally vague nor were they promulgated in violation of the principles of separation of powers. (*Id.*).

   *A. Allegations in the Indictment* [3]

   The Indictment alleges the following. Defendant was the president and owner of CSE. (Docket No. 1 at ¶ 1). He had authority and oversight over all projects being performed by CSE. (*Id.*). CSE was a non-DBE steel erection and precast concrete erection subcontractor based in Dravosburg, Pa. (*Id.*). CSE was owned by Defendant and operated by him and Darlaine Taylor, vice president. (*Id.*). T.L. was the controller for the company, managing the finances of CSE and reporting directly to Defendant, starting in July of 2011 . (*Id.* at ¶ 2). Watson Maloy was the president and sole owner of WMCC, a certified DBE. (*Id.* at ¶ 3).

   The Indictment details the federal government's establishment of the DBE Program through the DOT and its sub-agency, the Federal Highway Administration, ("FHWA"), and outlines the associated statutes and regulations governing same. (*Id.* at ¶ 4). The FHWA provides billions of dollars annually in federal funding to state departments of transportation for the construction and maintenance of the federal highway system. (*Id.*). The DBE Program is structured to increase the participation of DBEs in these federally funded highway construction projects, setting a goal of ten-percent participation. (*Id.* at ¶¶ 4-5). Pertinent here, the Pennsylvania Department of Transportation ("PennDOT") and the Pennsylvania Turnpike Commission ("PTC") receive federal funds from FHWA for federally funded highway projects

---

[3]    In analyzing a pretrial motion to dismiss, the Court must accept the factual allegations set forth in the indictment as true. *See United States v. Huet*, 665 F.3d 588, 595-96 (3d Cir. 2012).

and, as a result of same, are required to establish goals and objectives in administering the DBE Program. (*Id.*). State and local authorities are also delegated the responsibility to administer the program by, among other things, certifying entities as DBEs; tracking the usage of DBEs on federally funded highway projects through the award of credits to general contractors on specific projects; and reporting compliance with the participation goals to the federal authorities. (*Id.* at ¶¶ 4-15).

Between January 2012 and February 2014, "WMCC received 13 federally-funded subcontracts totaling approximately $2.34 million under PennDOT's and PTC's DBE program and WMCC was paid a total of $1.89 million." (*Id.* at ¶ 12). These subcontracts were between WMCC and a general contractor, and required WMCC to furnish and erect steel and/or precast concrete on federally funded Pennsylvania highway projects. (*Id.*). Under PennDOT's program, the entire amount of WMCC's subcontract with the general contractor, including the cost of materials and labor, was counted toward the general contractor's DBE goal because WMCC was certified as a DBE and "ostensibly performed a commercially useful function in connection with the subcontract." (*Id.*).

The grand jury charges that Defendant and other persons known to it, agreed to "defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental function of the USDOT in the implementation, execution and administration of the DBE program." (*Id.* at ¶ 13). The stated purpose of the conspiracy was for Defendant and his co-conspirators to enrich themselves by using WMCC as a "front" company to fraudulently obtain the profits on DBE subcontracts slotted for legitimate DBE's and to increase CSE profits by marketing CSE to general contractors as a "one-stop shop" which could not only provide the

concrete or steel beams, but also erect the beams and provide the general contractor with valuable DBE credits. (*Id.* at ¶ 14).

The manner and means of the conspiracy is extensively detailed in ¶ 15 of the Indictment. Among other things:

- the conspirators used WMCC as a front company, where funds were passed to CSE in order to obtain the appearance of DBE participation on subcontracts WMCC was awarded under the programs which in reality were performed by CSE personnel;
- under Defendant's direction and authority, CSE personnel found, negotiated, coordinated, performed, managed, and supervised the subcontracts awarded to WMCC and paid WMCC a fixed-fee for use of its name so that CSE could obtain the profits;
- CSE estimators/project managers, found the jobs, prepared bids, mailed, faxed and negotiated the actual contracts;
- CSE engineers, project managers and superintendents drafted erection drawings, negotiated crane rentals, arranged for transportation of materials to the job site, and recruited union workers to perform WMCC's subcontract work;
- the conspirators fraudulently induced the award of DBE subcontracts to WMCC and the payments to WMCC by "creating the illusion" that WMCC was doing the work;
- the conspirators concealed the fact that CSE personnel were doing all of this work through false representations by Maloy to the Port Authority of Allegheny County that he was doing the work, and by CSE personnel to the general contractors as they would use WMCC letterhead on faxes and mailings on documents pertaining to the subcontracts;
- CSE personnel also submitted "phony" time sheets and payroll reports to PennDOT, PTC and the general contractors stating that WMCC employees were doing erection work;
- CSE personnel "pretended" to be WMCC personnel when attending construction progress meetings at PennDOT or PTC field offices and when contacting general contractors and government officials;
- CSE personnel used WMCC's email account to communicate with PennDOT, PTC officials, general contractors and suppliers. They also possessed WMCC business cards, t-shirts and hard hats. They disguised vehicles used to transport tools and materials to job sites by placing magnetic signs over CSE logos on the vehicles.

- CSE personnel were directed to use Maloy's signature stamp on various documents, such as endorsing checks; signing union benefit documents and certifying payrolls; and,
- CSE personnel established fax and phone lines at CSE offices to receive WMCC faxes and phone calls.

(*Id.*).  As a result of these maneuvers, the conspirators caused general contractors to pay WMCC for DBE subcontracts and were deceived into crediting expenditures toward DBE participation goals although they were not eligible for such credits because WMCC was not performing a commercially useful function on the jobs.  (*Id.* at ¶ 15.v).  CSE also obtained profits from lucrative DBE subcontracts that it was not entitled to receive as it was not a DBE and thereby precluded legitimate DBE's from obtaining such contracts.  (*Id.* at ¶ 15.vi).

Defendant and Maloy allegedly conspired to engage in this scheme in exchange for the payment of a "fixed fee" to Maloy directly.  (*Id.* at ¶ 16).  CSE then caused a series of checks to be issued to Maloy, as outlined in the Indictment.  (*Id.*).  WMCC obtained at least 13 separate subcontracts for which it did not perform a commercially useful function, including:

| No. | PennDOT/PTC ECMS/CDMS Tracking No. | General Contractor | Contract Execution/ Notice to Proceed Date | Amount GC Paid WMCC & Credited to DBE Goal |
|-----|-----|-----|-----|-----|
| 1. | 24861 | Plum Contracting, Inc. | 8/6/2013 | $126,781.50 |
| 2. | 27406 | J.F. Shea Construction, Inc. | 12/11/2013 | $54,728.90 |
| 3. | 30735 | Marricco Construction Co. Inc. | 8/14/2013 | $50,466.52 |
| 4. | 50962 | Swank Construction Co. LLC | 6/13/2012 | $49,745.93 |
| 5. | 71116 | Golden Triangle Construction Co. Inc. | 7/16/2012 | $290,172.91 |
| 6. | 83124 | Mosites Construction Co. | 9/19/2012 | $166,017.05 |
| 7. | 84517 | Swank Construction Co. LLC | 1/17/2013 | $14,843.00 |
| 8. | 87749 | Trumbull Corporation | 4/26/2012 | $286,874.17 |
| 9. | 95044 | Hercules Painting Co. Inc. | 6/5/2012 | $25,635.11 |
| 10. | T-020.47S001-3-02 | Lane Construction | 8/2012 | $147,125.00 |
| 11. | T-027.77S001-3-02 | Guilsek Construction | 7/2013 | $185,820.00 |
| 12. | T-099.00T002-3-03 | Charles J. Merlo | 1/2012 | $86,071.57 |
| 13. | T-063.06S001-3-02 | Plum Contracting, Inc. | 1/2012 | $410,000.00 |

(*Id.* at ¶ 15.xii.).

Defendant is charged at Counts Two and Three with two counts of wire fraud in violation of 18 U.S.C. § 1343 related to subcontracts with J.F. Shea Construction, Inc. (*Id.* at ¶ 18). He is alleged to have committed eight counts of mail fraud in violation of 18 U.S.C. §1341 for causing fraudulent documents to be sent in the mail on projects for Golden Triangle Construction; Plum Contracting, Inc.; Lane Construction; Guilsek Construction Co.; and Swank Construction Co., at Counts Four through Eleven. (*Id.* at ¶ 20). The remaining counts relate to the financial aspects of the scheme, with Count Twelve charging conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) and Counts Thirteen and Fourteen alleging that Defendant engaged in monetary transactions derived from unlawful activity in violation of 18 U.S.C. §§ 1957(a) and 2. (*Id.* at ¶¶ 21-25).

### B. Legal Standard

Motions to dismiss are governed by Rule 12 of the Federal Rules of Criminal Procedure. FED. R. CRIM. P. 12. Specifically, Rule 12(b)(3)(B) provides that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to . . . state an offense." FED. R. CRIM. P. 12(b)(3)(B). The requirements of the contents of an indictment are set forth in Rule 7 of the Federal Rules of Criminal Procedure. FED. R. CRIM. P. 7. Pursuant to Rule 7(c)(1), an indictment must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and "must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." FED. R. CRIM. P. 7(c)(1). The purpose of the promulgation of Rule 7 was to abolish detailed pleading requirements and the technicalities previously required in criminal pleading. *See United States v. Huet*, 665 F.3d 588, 594 (3d Cir. 2012) (citing *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007)); *see also United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir.

2011) (same citation). "Although detailed allegations may have been required under a common law pleading regime, they 'surely are not contemplated by [the Federal Rules].'" *Huet*, 665 F.3d at 594 (quoting *Resendiz-Ponce*, 549 U.S. at 110).

As to the sufficiency of an indictment, the United States Court of Appeals for the Third Circuit has held that:

> [A]n indictment [is] sufficient so long as it '(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.' *United States v. Vitillo*, 490 F.3d 314 (3d Cir. 2007) (internal quotation marks omitted). Moreover, 'no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.' *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989).

*Bergrin*, 650 F.3d at 264 (quoting *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007)). "Generally, an indictment will satisfy these requirements where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred." *Huet*, 665 F.3d at 595 (citing *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005)).

> In determining whether an indictment validly states the elements of the offense, we need not blindly accept a recitation in general terms of the elements of the offense. *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002). "Federal Rule of Criminal Procedure 12(b)(3)(B) allows a district court to review the sufficiency of the government's pleadings to ... ensur[e] that legally deficient charges do not go to a jury." *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011). Although the Government is not required to set forth its entire case in the indictment, "if the specific facts" that are alleged "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation," the indictment fails to state an offense. *Panarella*, 277 F.3d at 685; *see United States v. Schiff*, 602 F.3d 152, 162–66

(3d Cir. 2010) (finding that indictment alleging "failure to rectify misstatements of others" did not, as a matter of statutory interpretation, state an offense under 18 U.S.C. § 78j(b) and SEC Rule 10b–5). However, the scope of a district court's review at the Rule 12 stage is limited. "[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) (citations omitted). "The government is entitled to marshal and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant to Federal Rule of Criminal Procedure 29." *Id.* at 661. There is no criminal corollary to the civil summary judgment mechanism. *Id.* In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment. *United States v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). "Evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at this stage." *Bergrin*, 650 F.3d at 265 (internal marks and citation omitted). Thus, a district court's review of the facts set forth in the indictment is limited to determining whether, assuming all of those facts as true, a jury could find that the defendant committed the offense for which he was charged. *Panarella*, 277 F.3d at 685; *DeLaurentis*, 230 F.3d at 660.

*Huet*, 665 F.3d at 595-96.

### C.  Discussion

Before addressing the specific arguments, in light of the governing standard, the Court must limit its consideration of Defendant's Motion to Dismiss to the allegations set forth in the indictment.  As this Court has noted previously, in evaluating an indictment's sufficiency,

this Court's task is to interpret the language of the four corners of the indictment.  *See Vitillo*, 490 F.3d at 321 (a "challenge to the sufficiency of the indictment should be decided based on the facts alleged within the four corners of the indictment, not the evidence outside of it."). Hence, matters external to the Indictment, [ …], cannot be considered by the Court at this stage of the litigation. *See Huet*, 665 F.3d at 595-96.

*United States v. Segura*, 2016 WL 1623182, at *4 (W.D. Pa. Apr. 25, 2016). Therefore, the Court has not considered the extraneous matters that have been placed before the Court in reaching its decision on the pending Motion to Dismiss, including:

- the criminal Information and the excerpt of the transcript of the plea colloquy in Maloy's case at Criminal No. 14-235, (Defense Exhibits A, B);
- defense proffers that "no federal money was involved in any of the projects at issue in the indictment," (Docket No. 35 at 4, n.1), and that the quality of the work performed on the jobs has not been questioned by the contracting authorities;
- the Application and Affidavit for Search Warrant, Search and Seizure Warrant, and Inventory Returns at Misc. No. 14-128M, (Defense Exhibits C, D); and,
- the parties' Joint Stipulation of Facts, (Docket No. 48), and the exhibit introduced at the hearing, (Docket No. 49-2).

With that background, the Court will first discuss its evaluation of Defendant's motion to dismiss Count One and then proceed to its analysis of the challenges to the federal regulations underlying all of the counts.

      i.    <u>Motion to Dismiss – Count One</u>

Defendant initially seeks to dismiss Count One charging him with defrauding the United States in violation of 18 U.S.C. § 371 on the theory that it is mischarged under the "defraud clause" of § 371 rather than the "offense clause" of § 371. (Docket Nos. 33, 35, 44, 52). Section 371 provides that:

> [i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. As this Court has previously noted:

> conspiracy to commit certain offenses against the United States under 18 U.S.C. § 371 […] is a distinct offense from a conspiracy

to defraud the United States under the same statute, commonly referred to as a *Klein* conspiracy. *See United States v. McKee*, 506 F.3d 225, 238 n. 10 (3d Cir. 2007) (citing *United States v. Klein*, 247 F.2d 908 (2d Cir.1957)). "In order to prove a conspiracy to defraud the United States in violation of 18 U.S.C. § 371 [ ... ], the evidence must establish the following elements beyond a reasonable doubt: (1) an agreement to defraud the United States, (2) an overt act by one of the conspirators in furtherance of that objective, and (3) any conspirator's commission of at least one overt act in furtherance of the conspiracy." *McKee*, 506 F.3d at 238 (citing *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir.1989)).

*United States v. Manfredi*, 628 F. Supp. 2d 608, 640 (W.D. Pa. 2009); *cf. United States v. Rigas*, 605 F.3d 194, 206-07 (3d Cir. 2010). "'To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.'" *Rigas*, 605 F.3d at 220 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924)). Further, "the statutory language in the '*specific* [defraud] clause of § 371 ... reaches any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government.'" *Rigas*, 605 F.3d at 220 (quoting *Dennis v. United States*, 384 U.S. 855, 860-61, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966)) (emphasis in original). The Government must demonstrate that a conspirator "'has knowledge of the conspiracy's illicit purpose when he performs acts which further that illicit purpose.'" *United States v. Park*, 505 F. App'x 186, 188 (3d Cir. 2012) (quoting *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975)). Finally, "knowledge and intent may be inferred from conduct that furthered the purpose of the conspiracy." *Id.* at 189 (quoting *United States v. McKee*, 506 F.3d 225, 241 (3d Cir. 2007) (further citations omitted).

Defendant essentially argues that the conspiratorial agreement was to defraud the state or local agencies and that the overt acts made in furtherance of the conspiracy involved Defendant

making and/or causing others to make material misrepresentations to state or local entities or general contractors such that the Indictment fails to state an offense that he participated in a conspiracy to defraud the United States. (Docket Nos. 33, 35, 44, 52). The Government counters that the Indictment sufficiently charges Defendant with conspiracy to defraud the United States and while many of the overt acts alleged in the Indictment were made initially to the state or local agencies and to general contractors, all were all done in furtherance of the scheme to defraud the United States and the lawful functioning of the DOT's DBE Program. (Docket Nos. 40, 46, 51). After careful consideration of the parties' arguments, the Court agrees with the Government's position and will deny the motion to dismiss Count One.

In this Court's estimation, the Indictment sufficiently charges Defendant with violating the "defraud clause" of 18 U.S.C. § 371 in accordance with the pleading standards set forth in Rule 7, as it has been interpreted by the Court of Appeals. To this end, the Indictment identifies the statutory provision that was allegedly violated; contains all of the essential elements of the charge; provides Defendant with a sufficient factual orientation of the Government's case against him so that he can prepare his defense; and outlines more than enough information to permit Defendant to plead a former acquittal or conviction in any subsequent prosecution. *See Bergrin*, 650 F.3d at 264. Although detailed factual allegations are not required under Third Circuit jurisprudence, the factual allegations supporting Count One are robust, comprising 14 pages, set forth in 16 separate paragraphs and multiple subparagraphs, rather than a rote summary of the elements supported by a cursory factual description. (Docket No. 1). It is also this Court's opinion that the facts alleged therein do not "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation," *Panarella*, 277 F.3d at 685, such that the Court cannot conclude that Count One fails to state an offense under the "defraud clause" of § 371.

Specifically, the Indictment literally tracks the relevant statutory language of § 371 and states that Defendant "and other persons and entities known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree together to: defraud the United States by impeding, impairing, obstructing, and defeating the lawful governmental function of the USDOT in the implementation, execution and administration of its DBE program." (Docket No. 1 at ¶ 13). The Indictment also outlines with great specificity how the DBE program was established by the United States, the federal standards that are set for same, how funding is provided by the United States to the individual states, and how certain aspects of the program are delegated to the state and local authorities. (*Id.* at ¶¶ 4-11). The grand jury alleges that Defendant and Maloy agreed to use WMCC as a "front" to shield from the implementing agencies and general contractors that CSE was performing the commercially useful functions on the highway projects, causing general contractors and state authorities to credit DBE participation toward CSE's activities, undermining the DBE Program. (*Id.*). A lengthy exposition of overt acts taken in furtherance of the conspiracy is listed in the Indictment and need not be fully repeated here. (*Id.* at ¶ 15). Most relevant, however, is that between January 2012 and February 2014,

> WMCC received 13 federally-funded subcontracts totaling approximately $2.34 million under PennDOT's and PTC's DBE program and WMCC was paid a total of $1.89 million. The subcontracts, which were between WMCC and a [general contractor], generally required WMCC to furnish and erect steel and/or precast concrete on federally-funded Pennsylvania highway projects. Under PennDOT's DBE program, the entire amount of WMCC's subcontract with the [general contractor], including the cost of materials and labor, was counted toward the [general contractor's] DBE goal because WMCC as certified as a DBE, and ostensibly performed a commercially useful function in connection with the subcontract.

(*Id.* at ¶ 12). The charge continues that "[i]t was further part of the conspiracy that as a result of the defendant and his co-conspirators' fraudulent and deceptive conduct, [they] … deprived USDOT, FHWA, PennDOT, and the PTC of controlling how its money should be spent; and deprived legitimate DBE's of the profits from subcontracts that were designated for their benefit." (*Id.* at ¶ 15.vi). Overall, these allegations suffice to plead all of the essential elements of the § 371 charge, including that the purpose of the conspiracy was to defraud the United States by "impairing, obstructing, or defeating the lawful function" of the DOT's DBE Program. *Rigas,* 605 F.3d at 220. Hence, the Court must permit the Government "to marshal and present its evidence at trial," at which time the Government will be required to prove all of the elements of the charge beyond a reasonable doubt. *DeLaurentis,* 230 F.3d at 660.

In support of his position, Defendant relies heavily on *Tanner v. United States,* 483 U.S. 107, 128 (1987) and *United States v. Licciardi,* 30 F.3d 1127 (9th Cir. 1994). The Court finds both decisions to be distinguishable for several reasons. First, neither opinion analyzed a pretrial motion to dismiss under the legal standards articulated above; both courts evaluated the sufficiency of the evidence supporting verdicts in favor of the government. *See id.* Second, Defendant's interpretation of *Tanner* and *Licciardi* extends their respective holdings beyond their ordinary reach. In *Tanner*, the Supreme Court merely rejected the Government's theory that because its Rural Electric Administration had delegated its authority to Seminole Electric Cooperative, Inc., a conspiracy to defraud Seminole therefore constituted a conspiracy to defraud the United States under § 371. *Tanner,* 483 U.S. at 129. But, the Supreme Court did not hold that the Government could not have proven its case, as is noted by the Ninth Circuit in *Licciardi*, which explained that:

> the Court in *Tanner* held that the conspiracy conviction could be
> upheld if, on remand, the court of appeals found that there was

> sufficient evidence to establish that the defendants had conspired to cause Seminole to make misrepresentations to the REA. In that event the defendants would have had the requisite *mens rea* of defrauding the United States, using an intermediary to accomplish their fraud.

*Licciardi*, 30 F.3d at 1132 (internal citation omitted).  Similarly, the Ninth Circuit in *Licciardi* found that the Government had failed to present sufficient evidence at trial to demonstrate that the defendant had the requisite *mens rea* to defraud the Bureau of Alcohol, Tobacco, and Firearms; the conviction was upheld on an alternative basis.  *Id.* at 1131-32.  Third, *Tanner* and *Licciardi* did not involve the type of conspiracy to defraud the United States that is charged in this case involving the DBE Program and other courts have upheld verdicts in cases similar to this one.  *See e.g., United States v. Brothers Const. Co. of Ohio*, 219 F.3d 300, 312-13 (4th Cir. 2000) (upholding conviction of conspiracy to defraud United States in DBE fraud involving West Virginia Department of Transportation highway project); *United States v. Nagle*, 2013 WL 3894841, at *17 (M.D. Pa. Jul. 26, 2013) (upholding conviction for conspiracy to defraud the United States and to commit mail fraud and wire fraud, noting that "[t]he Government sustained its burden, in large part, by way of circumstantial evidence establishing that Defendant was intimately involved with SPI's business and knowingly acted for the purpose of furthering the scheme to defraud the Department of Transportation's DBE program.").  Finally, consistent with *Tanner* and *Licciardi*, it will be the Government's burden to prove at trial that Defendant participated in the conspiracy with the intent to defraud the United States, as he has been charged in this Indictment, and the overt acts taken by conspirators directed toward the general contractors, state and local authorities may be relevant toward proving such intent.  *See McKee*, 506 F.3d at 241 ("knowledge and intent may be inferred from conduct that furthered the purpose of the conspiracy.").

Based on the foregoing, Defendant's Motion to Dismiss Count One is denied.

ii.    Motion to Dismiss – Challenges to DBE Regulations

Defendant next seeks dismissal of the Indictment[4] by contesting the propriety of the underlying regulations in several different respects.  (Docket Nos. 33, 35, 44, 52).  In this regard, he claims that 49 C.F.R. § 26.55(c) is "void for vagueness" because the phrase "commercially useful function" and other phrases therein are not sufficiently defined.  (*Id.*).  Defendant also presents a non-delegation challenge to the regulatory scheme involving the DBE Program. (*Id.*). The Government counters that dismissal of the Indictment is not justified under these theories and that the challenges to the regulations should be overruled.  (Docket Nos. 40, 46, 51).  For the following reasons, the Court once again concurs with the Government's assessment and denies the motion to dismiss.

With respect to the vagueness challenge, the Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMD. V. In the context of criminal prosecutions,[5] it is well established that "a criminal statute must give fair warning of the conduct that it makes a crime." *Rogers v. Tennessee*, 532 U.S. 451, 457 (2001) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964)) (internal quotation marks omitted) (collecting cases).  A criminal statute may be deemed void for vagueness if the challenged statute:

(1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits; or (2)

---

[4]    The Court construes Defendant's arguments as reaching all fourteen counts of the Indictment given that the challenged regulations are set forth in paragraphs 8 and 9 of the Indictment and those paragraphs are incorporated into each of the charges.  (*See* Docket No. 1).  While the Court focuses much of its discussion on the conspiracy and fraud counts, this ruling is equally applicable to all of the counts.

[5]    The Court notes that the parties initially debate the legal standard that should be applied in analyzing Defendant's vagueness challenge as attacking a criminal statute or federal regulations, pointing to certain nuances in those standards.  (*See* Docket Nos. 35, 40).  It is the Court's opinion that this dispute is academic because the regulation at issue here, 49 C.F.R. § 26.55(c), is not vague even when analyzed under the more stringent standard applied to criminal statutes.

> authorizes or even encourages arbitrary and discriminatory enforcement. The inquiry is undertaken on a case-by-case basis, and a reviewing court must determine whether the statute is vague as-applied to the affected party.

*United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009) (internal citations and quotation marks omitted). "[T]he Supreme Court has held that scienter requirements in criminal statutes 'alleviate vagueness concerns,' because a *mens rea* element makes it less likely that a defendant will be convicted for an action that he or she committed by mistake." *Id.* (citing *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007)). "The party bringing the vagueness challenge bears the burden of demonstrating that the statute is vague as applied to him or her." *United States v. Ferriero*, Crim. No. 13-592 ES, 2015 WL 225806, at *17 (D.N.J. Jan. 15, 2015) (citing *Aiello v. City of Wilmington*, 623 F.2d 845, 850 (3d Cir. 1980)).

The Court first notes that Defendant is not criminally charged with violating the regulations; rather, he is accused of violating 18 U.S.C. §§ 371 (conspiracy), 1341 (mail fraud), 1343 (wire fraud), 1956(h) (money laundering conspiracy), and 1957 (engaging in monetary transactions derived from unlawful activity). (*See* Docket No. 1). As the Government points out, Defendant does not argue that any of these statutes are void for vagueness and the Court is aware of no authority supporting such a position. *See e.g., United States v. Morosco*, 822 F.3d 1 (1st Cir. 2016) (§ 371 conspiracy to defraud the United States is not void for vagueness); *United States v. Rankin*, 870 F.2d 109, 113 (3d Cir. 1989) (rejecting defendant's argument that indictment charging conspiracy to defraud the United States should be dismissed due to "vagueness of this concept"). Further, to sustain convictions under each of these statutes, the Government is required to prove that Defendant acted with the necessary criminal intent at each count; not that he intended to violate the underlying regulations. *Cf. United States v. Maxwell*, 579 F.3d 1282, 1302 (11th Cir. 2009) (emphasis added) ("[T]he specific intent required under

the mail and wire fraud statutes is the intent to defraud, <u>not the intent to violate a particular</u> <u>statute or regulation</u>.").  Thus, Defendant's motion to dismiss must fail.

In any event, the Court disagrees with Defendant's assessment that the challenged DBE regulations are so vague that people of ordinary intelligence cannot ascertain the meaning of same including the phrases "commercially useful function;" "industry practices;" and "other relevant factors."  *See* 49 C.F.R. § 26.55(c).[6]  Courts have rejected vagueness and related challenges to the DBE regulations in both civil, *see Midwest Fence Corp. v. United States Dep't of Transp.*, 840 F.3d 932 (7th Cir. 2016) (rejecting vagueness challenge to 49 C.F.R. § 26.53(a) and "good faith efforts" language), and criminal matters, *Maxwell*, 579 F.3d at 1302.  With respect to the alleged vagueness of the phrase "commercially useful function," the regulation both specifically describes the types of activities that: (1) fall within the definition of that phrase in § 26.55(c)(1); and, (2) are beyond the scope of the definition of that phrase in § 26.55(c)(2). 49 C.F.R. §§ 26.55(c)(1)-(2).  The phrases "industry practices" and "other relevant factors" are

---

[6]        The challenged regulation, § 26.55(c) provides as follows:
>        (c) Count expenditures to a DBE contractor toward DBE goals only if the DBE is performing a commercially useful function on that contract.
>
>        (1) A DBE performs a commercially useful function when it is responsible for execution of the work of the contract and is carrying out its responsibilities by actually performing, managing, and supervising the work involved. To perform a commercially useful function, the DBE must also be responsible, with respect to materials and supplies used on the contract, for negotiating price, determining quality and quantity, ordering the material, and installing (where applicable) and paying for the material itself. To determine whether a DBE is performing a commercially useful function, you must evaluate the amount of work subcontracted, industry practices, whether the amount the firm is to be paid under the contract is commensurate with the work it is actually performing and the DBE credit claimed for its performance of the work, and other relevant factors.
>        (2) A DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation. In determining whether a DBE is such an extra participant, you must examine similar transactions, particularly those in which DBEs do not participate.

49 C.F.R. § 26.55(c).

undefined, but "an undefined word or phrase does not render a statute void when a court could ascertain the term's meaning by reading it in context." *United States v. Harder*, 168 F. Supp. 3d 732, 742 (E.D. Pa. 2016) (citing *Boos v. Barry*, 485 U.S. 312, 33 (1988)). The context here is that these regulations are used in a comprehensive regulatory scheme by the DOT and FHWA to ensure participation of DBEs in federally funded highway construction projects. These particular phrases are also not the most prominently featured in the regulations as they are utilized in a sentence describing how to determine if the activities of a DBE constitute a "commercially useful function." *See* 49 C.F.R. § 26.55(c). While Defendant suggests that the language of these undefined phrases is overbroad, it is necessarily limited by § 26.55(c)(2), expressly stating that "[a] DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation." 49 C.F.R. § 26.55(c).

This Court also finds persuasive the reasoning of both the United States District Court for the Southern District of Florida and the United States Court of Appeals for the Eleventh Circuit, construing the DBE regulations in *United States v. Maxwell*. To this end, in *Maxwell*, the defendant argued in a post-trial motion that § 26.55(c) was "ambiguous" and the evidence presented at trial showing that he violated this regulation could not support his convictions for various mail and wire fraud offenses. The trial court disagreed, holding that:

> the rules involving which entities must do the DBE/CSBE work
> are not ambiguous, or susceptible to different but equally plausible
> interpretations. Rather, the rules clearly state that a DBE [...] is
> required to do its own work, which includes managing, supervising
> and performing the work involved. ... And, under the federal
> program, it is clear that the DBE is also required to negotiate,
> order, pay for, and install its own materials.

*Maxwell*, Cr. No. 1:05-cr-20571-PAS, Document No. 188, at 9 (S.D. Fla Mar. 1, 2007) (citing

C.F.R. § 26.55(c)(1)).   The defendant made this same argument on appeal to the Eleventh

Circuit, which soundly rejected it, explaining that:

> [b]oth the County and federal regulations explicitly say that a CSBE or DBE is required to perform a commercially useful function. Both regulatory schemes define a commercially useful function as being responsible for the execution of the contract and actually performing, managing, and supervising the work involved. And the DBE regulations make clear that a DBE does not perform a commercially useful function if its role is limited to that of an extra participant in a transaction, contract, or project through which funds are passed in order to obtain the appearance of DBE participation. 49 C.F.R. § 26.55(c)(2). There is no obvious ambiguity about whether a CSBE or DBE subcontractor performs a commercially useful function when the job is managed by the primary contractor, the work is performed by the employees of the primary contractor, the primary contractor does all of the negotiations, evaluations, and payments for the necessary materials, and the subcontractor does nothing more than provide a minimal amount of labor and serve as a signatory on two-party checks. In short, no matter how these regulations are read, the jury could conclude that what FLP did was not the performance of a "commercially useful function."

*United States v. Maxwell*, 579 F.3d 1282, 1302 (11th Cir. 2009).  Thus, the *Maxwell* court found

that the regulations were sufficient in the context of a scheme similar to that charged against

Defendant here: WMCC was "fronted" as the DBE, receiving a fixed fee for passing through

funds to CSE, which utilized its personnel to perform virtually all of the work under the

subcontracts.   (Docket No. 1).   Accordingly, Defendant has failed to meet his burden to

demonstrate that the Indictment should be dismissed under this theory.

Defendant's final efforts to dismiss the charges rely upon his unsupported claims that the

DOT lacked the authority to promulgate the DBE regulations and that it exceeded its authority in

doing so.   (Docket Nos. 33, 35, 44, 52).   As the Government maintains, this type of non-

delegation argument is rarely successful, with only two instances where the Supreme Court has

invalidated legislation on this basis. *See, e.g., Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472, 121 S. Ct. 903, 912, 149 L. Ed. 2d 1 (2001) ("[i]n the history of the Court we have found the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'"); *United States v. Cooper*, 750 F.3d 263, 268 (3d Cir. 2014) (same); *Harder*, 168 F. Supp. 3d at 740-41 (same). Here, the Government's exhaustive summary of the legislative history and executive rulemaking that has taken place with respect to the relevant statutory provisions and regulations suffices to demonstrate that the DBE regulations were made under the broad grant of rights authorized by Congressional statutes. *See, e.g.,* 49 U.S.C. § 322(a) ("The Secretary of Transportation may prescribe regulations to carry out the duties and powers of the Secretary. An officer of the Department of Transportation may prescribe regulations to carry out the duties and powers of the officer."); 23 U.S.C. § 304 (The Secretary of Transportation "should assist, insofar as feasible, small business enterprises in obtaining contracts in connection with the prosecution of the highway system."); 23 U.S.C. § 315 ("[Subject to certain exceptions related to tribal lands and national forests], the Secretary is authorized to prescribe and promulgate all needful rules and regulations for the carrying out of the provisions of this Title."). The DBE Program has also been upheld in various contexts, even surviving strict scrutiny review, with courts holding that the program is narrowly tailored to further compelling governmental interests. *See Midwest Fence Corp.*, 840 F.3d 942 (citing *Western States Paving Co. v. Washington State Dep't of Transportation,* 407 F.3d 983, 993 (9th Cir. 2005); *Sherbrooke Turf, Inc. v. Minnesota Dep't of Transportation*, 345 F.3d 964, 973 (8th Cir. 2003); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1155 (10th Cir. 2000)). In light

of this authority, the Court holds that Defendant has failed to meet his burden to demonstrate that dismissal of the Indictment is warranted.

### D. Conclusion

For the reasons set forth herein, Defendant's Motion to Dismiss [33] is DENIED.

### IV.    MOTION TO SUPPRESS

Defendant next moves to suppress the evidence seized on February 11, 2014 under a search warrant issued on February 6, 2014 by United States Magistrate Judge Lisa Pupo Lenihan authorizing the search of the offices of Century Steel Erectors, located at 210 Washington Avenue, Dravosburg, Pennsylvania.  (Docket Nos. 33, 35, 44, 52).  Defendant contends that the warrant fails for several reasons including that it lacks sufficient probable cause to justify the intrusion and is unconstitutionally overbroad.  (*Id.*).  The Government counters that Defendant lacks standing under the Fourth Amendment to challenge the warrant authorizing the search of the business premises and seizure of business records in light of *United States v. Nagle*, 803 F.3d 167, 176 (3d Cir. 2015).  (Docket Nos. 40, 46, 51).  The Government further maintains that, if the Court entertains the suppression motion, it should uphold the warrant as well as the search and seizure conducted thereunder.  (*Id.*).  Upon consideration of the parties' positions and the evidence of record, the Court holds that under the binding authority of *Nagle*, Defendant has failed to demonstrate a reasonable expectation of privacy in CSE's offices and the business records and other items seized under the warrant.  Accordingly, Defendant's motion to suppress must be denied.

### A. Stipulated Facts

The Court turns to the parties' stipulated facts, which the Court accepts as true for purposes of this motion.

3. [Defendant] is the owner and president of Century Steel Erectors Company, LP, ("CSE"), a steel erection company with its corporate headquarters located at 210 Washington Avenue, Dravosburg, Pennsylvania 15034.

4. [Defendant]'s daughter, Darlaine Taylor, is the Executive Vice President of CSE.

5. CSE receives approximately $40 million in annual revenue from construction projects undertaken largely in and around the Greater Pittsburgh area.

6. [Defendant] is the 99% owner and limited partner of CSE. Century Construction Management, Inc. ("CCM") is the general partner and 1% owner of CSE. [Defendant] purchased CSE on or about July 1, 2011. [Defendant] is the 100% owner of CCM.

7. The property located at 210 Washington Avenue, Dravosburg, Pennsylvania, consists of approximately thirty (30) acres, along with several buildings, including a shop/warehouse and office building containing the CSE corporate offices.

8. [Defendant] is the sole owner and general partner of the D.R. Taylor Family Limited Partnership, which purchased the land and buildings located at 210 Washington Avenue, Dravosburg, Pennsylvania, from Huntington Bank approximately one (1) year ago. Prior to that purchase, the property had been subject to bankruptcy proceedings by a third party. The business address of the D.R. Taylor Family Limited Partnership is 109 Dyers Stone Drive, Eighty-Four, PA 15034.

9. CSE pays monthly rent to the D.R. Taylor Family Limited Partnership for the use of the land and buildings at 210 Washington Avenue in Dravosburg.

10. CSE owns approximately $30 million worth of equipment, including cranes, trucks, and other construction tools. In the past year, CSE purchased approximately $600,000 worth of new equipment.

11. CSE employs approximately fourteen (14) individuals at the 210 Washington Avenue office building, including [Defendant] and his daughter Darlaine, seven (7) estimators, and several office staff. Three (3) additional employees work in the equipment yard and six (6) in the shop at the same location. CSE's satellite location, located at 1131 Freeport Road in Kittanning,

Pennsylvania, employs approximately three (3) individuals in the office, and two (2) in the shop.

12. CSE owns and maintains a computer system, including an email system, for its employees. [Defendant], however, rarely uses email.

13. [Defendant] would testify that he is frequently one of the first people to arrive at the CSE offices in the morning, and is in the office nearly every day. [Defendant] has the final say over the hiring and firing of office employees. He receives CSE's mail every day, opens all of it, and distributes it to the proper recipients. [Defendant] does not store personal documents at the CSE offices.

14. [Defendant], his daughter Darlaine, and CSE's controller, Thomas Liston, all have their own offices within the office building located at 210 Washington Avenue, Dravosburg. At the time of the search, estimators Andre Bilodeau and Brodie Claybaugh shared a trailer-office, a separate building from the main office building in which [Defendant] has his office. Both the trailer-office and the main office building are on the property at 210 Washington Avenue.

15. [Defendant] would testify that he meets in person or speaks by telephone every day with his field superintendents in order to monitor crane usage. He is also provided a list of the location of all cranes on a daily basis.

16. [Defendant] would testify that Mr. Liston provides [Defendant] with a listing twice a month of all open accounts payable. [Defendant] reviews that list and decides which vendors should be paid immediately so that Mr. Liston can prepare checks. [Defendant] reviews almost all checks to vendors before they are sent, and he signs them along with his daughter, Darlaine.

17. [Defendant] would testify that he also receives and reviews a monthly bid sheet and open job list in anticipation of CSE's monthly staff meeting. [Defendant] conducts that meeting and receives updates on all ongoing projects. Attendees discuss with [Defendant] the status of all projects (including the costs and degree of completeness), the status of bids CSE has submitted, the location and use of equipment, and whether the company's projects are proceeding according to the budget established by the original bid.

(Docket No. 48).

The parties also reached a number of additional agreements based on proffers made at the hearing. (Docket No. 53). To this end, it is uncontested that at the time of the search, the property at 210 Washington Avenue was owned by a third party, Ray Anthony, and not Defendant or any of the entities that he owns. (*Id.* at 17-8). No information has been presented regarding the nature of the relationship under which CSE leased or rented the property from Anthony at that time.[7] The investigators' search of the premises under the warrant resulted in the seizure of computers, all of which have been returned, and business records that were seized from various offices. (*Id.* at 16). The summary exhibit indicates that eighteen boxes were removed from the CSE Office Complex Location, seventeen labeled CS-1 through CS-17 and a box of t-shirts. (Docket No. 49-2). In addition, there were fourteen boxes of records seized from the trailer occupied by Andre Bilodeau and Brodie Claybaugh and two boxes from the Shop Building. (*Id.*). Overall, only two of the boxes seized, labeled CS-11 and CS-12, were removed from Room F of the CSE Office Complex Location, which was Defendant's office. (*Id.*). The search warrant inventory returns describe the items seized from Defendant's office, as follows:

| QUANTITY | DESCRIPTION OF ITEMS |
|---|---|
| 1 | Bid List |
| 1 | Summary Report – All projects |
| 1 | Century Steel Master Job List 2013 |
| 1 | Binder – Equipment List |
| 1 | Binder – Job Reference list |

---

[7] The Court notes that the affidavit supporting the warrant states that Anthony held an ownership interest in CCM at one time; although Defendant now apparently owns 100% of that entity. (*See* Docket No. 35-3 at ¶ 18 ("Century Steel is a non-DBE steel erection company partnered with Century CM, Inc. (Century), also a non-DBE construction company. Century is located at 210 Washington Ave., Dravosburg, PA 15034 and is owned by Donn Taylor, Thomas Tadda, and Ray Anthony.")).

| | |
|---|---|
| 1 | Binder – Master Jobs list |
| 1 | MC-90 Recording Tape – removed from handheld recorder in drawer. |
| 4 | White Envelopes containing employment records removed from drawer. |
| 1 | Binder Jobs = 2006-2007 |
| 1 | Binder Jobs = 2008-2009 |
| 1 | Binder Jobs = 2010-2011 |
| 1 | Folder Standard Iron Works |

(Defense Ex. D). Again, Defendant has stipulated that he did not store any personal documents at his office and the Court understands all of the items that were seized were business-related materials. (Docket No. 49 at ¶ 13). Defendant also offered no evidence that he excluded any of the other CSE employees from his office or precluded them from accessing any of the materials that were seized.

### B. Discussion

Helpfully, the Court of Appeals outlined the relevant legal standards in *Nagle*:

> A defendant who seeks to suppress evidence allegedly seized or discovered in violation of the Fourth Amendment must first demonstrate that the Government physically occupied his property for the purpose of obtaining information or that he had "a legitimate expectation of privacy that has been invaded by government action." *Free Speech Coal., Inc. v. Att'y Gen.*, 677 F.3d 519, 543 (3d Cir. 2012) (internal quotation marks omitted); *cf. Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." (internal quotation marks omitted)). To have a legitimate expectation of privacy, the defendant must show "an actual or subjective expectation of privacy in the subject of the search or seizure" and show that "this expectation of privacy is objectively

justifiable under the circumstances." *United States v. Donahue,* *764 F.3d 293, 298–99 (3d Cir.2014)* (internal quotation marks omitted). In other words, the expectation of privacy must be "one that society is prepared to recognize as reasonable." *Smith v. Maryland,* *442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)* (internal quotation marks omitted).

…

"An owner or operator of a business ... has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable." *482 U.S. 691, 699, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987).* But that expectation of privacy "is different from, and indeed less than, a similar expectation in an individual's home." *Id.* at *700, 107 S.Ct. 2636.* Although the Supreme Court has not clarified precisely how much "less" of an expectation of privacy a business owner has in commercial premises, we see a consensus among the Courts of Appeals that a corporate shareholder has a legitimate expectation of privacy in corporate property only if the shareholder demonstrates a personal expectation of privacy in the areas searched independent of his status as a shareholder.

*United States v. Nagle,* *803 F.3d 167, 176–77 (3d Cir. 2015),* *cert. denied,* *136 S. Ct. 1238, 194 L. Ed. 2d 186 (2016).* As to specifics, the Court of Appeals recognized that to challenge the search as a shareholder and executive, a defendant must "show a personal connection to the place searched or the item seized and that he attempted to keep the place and item private." *Id.* at *178.* With respect to a reasonable expectation of privacy in computers found in employees' offices, a defendant most show that he had a personal connection to the computers by using their computers, or accessing their files. *Id.* In regards to a network server, the Court reasoned that a defendant must show that he had a personal connection to the electronic files on the server and a reasonable expectation of privacy in those files as well as authority over who had access to those files. *Id.*

Applying these legal principles to the facts at hand, the Court must conclude that Defendant lacked a reasonable expectation of privacy in CSE's offices or the items that were seized, independent of his status as a shareholder. *See Nagle,* *803 F.3d at 177.* With respect to

the entry of the property, the record is undisputed that at the time of the issuance of the warrant and the search, February 6-11, 2014, Defendant had no *personal* interest in the location of CSE's office, i.e., 210 Washington Avenue, Dravosburg, Pennsylvania. The parties agree that Ray Anthony owned the property at that time but that it was also the subject of bankruptcy proceedings. (Docket No. 53 at 17-8). Further, Defendant did not present the Court with a lease or any other information concerning the relationship between CSE and Anthony from which the Court could determine that Defendant had a *personal* interest in that location. While Defendant has an office in one of the buildings where he works on a daily basis, he admits that thirteen other individuals work at CSE's main office building and has not offered any evidence demonstrating that those individuals lacked access to any areas of the facility, including his office, or that he took steps to keep his office private. (Docket No. 48 at ¶¶ 11-17). He likewise has not demonstrated that he had a *personal* interest in the offices of the other employees within the building where he typically works, or in the other buildings, including the trailer or the shop areas. (*Id.*).

As to the items that were seized, Defendant concedes that none of the materials constitute his personal effects and that they are all property of the business. This admission is supported by the descriptions of the items taken from Defendant's office such as "bid lists," "equipment lists," "job lists" and the like. (Defense Ex. D). These documents also appear to be of the type that Defendant admits he uses on a regular basis during meetings with other employees and distributes to them after opening the mail. (Docket No. 48 at ¶¶ 14-17). Defendant admits that he barely uses the computer equipment that was seized and that he "rarely uses email." (Docket No. 48 at ¶ 12).

At most, Defendant has shown that: he is the controlling shareholder of CSE, which is a rather large operation with $40 million in annual revenues and $30 million in equipment assets; he is actively involved in the day-to-day operations of the business; and that he ultimately owns the seized materials, albeit through at least two separate corporate entities. (Docket No. 48 at ¶¶ 6-10). But, *Nagle* teaches that this is not enough for a corporate shareholder to demonstrate Fourth Amendment standing to challenge a warrant issued to search the corporation's offices. *See Nagle*, 803 F.3d at 176-78. All told, the Court cannot conclude that Defendant met his burden to "show a personal connection to the place[s] searched or the item[s] seized and that he attempted to keep the place[s] and item[s] private." *Id.* at 178. Accordingly, Defendant's Motion to Suppress is denied.[8]

V.     CONCLUSION

Based on the foregoing, Defendant's Motion to Dismiss and Motion to Suppress [33] are DENIED. An appropriate Order follows.


                                        *s/Nora Barry Fischer*
                                        Nora Barry Fischer
                                        U.S. District Judge


Date:   February 2, 2017

cc/ecf:  All counsel of record.

---

[8]     Given this holding, the Court finds that it is in the interests of judicial economy to decline to fully discuss and resolve the parties' disputes as to the substantive challenges to the search warrant and execution thereof. *See United States v. Nagle*, No. 1:09-CR-384-01, 2010 WL 3516859, at *8 (M.D. Pa. Sept. 1, 2010), *aff'd*, 803 F.3d 167 (3d Cir. 2015) ("Because none of Defendant's Fourth Amendment rights were violated, there is no reason to reach a determination about the constitutionality of the Government's search methods. Doing so would be a futile waste of judicial resources.").